UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DARREN POST,

    Petitioner,

vs.

D.L. RUNNELLS, Warden,

    Respondent.
_____/

No. C 05-4323 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court. Petitioner has responded with a traverse. For the reasons set out below, the petition is denied.

**BACKGROUND**

On April 22 2002, petitioner was charged in Santa Clara County Superior Court with committing one count of burglary and one count of receiving stolen goods on December 20, 2001, and one count of burglary on December 28, 2001. The jury convicted him of burglary and receiving stolen property on December 28 incident, but deadlocked, and a mistrial was declared, on the burglary count stemming from the December 20 incident. The trial court sentenced petitioner to a term of 25 years to life in state prison in pursuant to California's "Three Strikes" law. On appeal, the California Court of Appeal affirmed his sentence and conviction. Review was denied by the California Supreme Court. Having exhausted his state remedies, petitioner filed the current habeas petition.

Petitioner does not dispute the following factual account of the crimes, which is

excerpted from the opinion of the California Court of Appeal:

1. The December 20 Burglary

On December 20, 2001, someone stole credit cards from three individuals working at Verisign Corporation (Verisign), a company located in Mountain View. In each case, the thief took the credit cards out of wallets or briefcases the victims had left unattended in their work cubicles. Two of the three victims were lured out of their cubicles by telephone calls telling them they had a visitor in the lobby. In both cases the telephone display indicated that the call was coming from someplace in the building other than the lobby. Another Verisign employee actually observed someone she did not know go into one of the victim's cubicles and open a desk drawer. The witness did not think much of the incident at the time because she thought the person was probably a Verisign employee and a friend of the victim. The witness later identified defendant as the person she saw on December 20.

2. The December 28 Burglary

Jason Hoffman was Verisign's security manager. On December 21, 2001, the three victims of the December 20 burglary told him about the theft of their credit cards. Exactly one week later, Hoffman was in his second floor cubicle when he received a call informing him he had a visitor in the lobby. The call was not coming from the lobby but from a conference room on the second floor. Hoffman knew enough not to fall for the ruse so he left his cubicle and stationed himself nearby. He saw defendant enter his cubicle and exit it about 20 seconds later. Hoffman called for assistance and returned to his cubicle where he discovered all his credit cards were missing from the wallet he kept in his backpack. A security guard brought defendant to Hoffman's workstation. Hoffman began questioning defendant and defendant became agitated and ran out of the building. Security guards pursued him outside where he was detained. The police arrived and found Hoffman's credit cards in defendant's pocket.

Earlier in the day on December 28, security guard Eric Frederito observed an Aramark employee approach the building to restock the vending machines. Defendant walked up with the Aramark employee. Presuming that the two were together, Frederito gave both of them visitor's badges. Defendant signed his name on the badge as "David ." The bottom portion of the badge included a notice that the wearer was to be escorted while in the building. At trial, Frederito identified the badge later found on defendant's person as the badge he had issued to him earlier that day. The bottom portion of the badge had been folded over so that it was not visible when the badge was worn.

Manuel Carmona, another security guard, escorted the Aramark employee and defendant to the area where the vending machines were located in Verisign's building six. Defendant then said he was in the wrong building and got directions to building three.

Tapes from Verisign surveillance cameras showed defendant in one of Verisign's buildings on December 28, 2001 and showed Hoffman trying to

stop defendant from leaving the building around 12:42 p.m. that day.

On February 14, 2002, defendant was at the Palo Alto courthouse sitting on a bench outside a courtroom when Sheriff's Deputy Richard Alanis walked past him. Defendant called out to Alanis: "Hey, dude, deputy. Why are they charging me with burglary? It is the wrong charge.... [¶][W]hat happened was I went into the guy's work place. I grabbed the guy's wallet from his back pocket and ran out. The guy owed me some money and I had to take care of it, you know?"

III. The Defense

Defendant claimed that he was not at Verisign on December 20, 2001 and that on December 28, 2001, Hoffman had voluntarily given him all of his credit cards to settle a debt. Defendant testified that he had spent part of the day on December 20, 2001 with his friend, Lavonne Simpson. His version of the December 28 incident was that he had met Jason Hoffman at a restaurant in early November and learned that Hoffman liked to smoke marijuana. Shortly thereafter defendant and Hoffman had entered into a transaction that concluded with Hoffman owing defendant $70. Hoffman supposedly had no cash at the time and told defendant to come to his work to collect it. Defendant went to Verisign to look for Hoffman's car in the parking lot but could not find it. He returned on December 28, 2001 around lunchtime and went into the building to find him. Hoffman still had no money. Defendant told him he needed the money to buy luggage because his grandmother had just died. According to defendant, Hoffman gave him all his credit cards to buy the luggage and settle the debt. Hoffman gave him all his credit cards because he was unsure which ones were "maxed out."

Richard Pieri testified that in early November 2001, defendant had telephoned Pieri to tell him he was at a nearby restaurant. Pieri stopped by the restaurant where he saw defendant and another man who defendant introduced to him as "Jason." A few months later, Pieri was at the Palo Alto courthouse where he saw a man he recognized as the Jason that defendant had introduced to him in November.

Simpson, a widow who had befriended defendant, testified that defendant was with her for part of the day on December 20, 2001. She was able to remember the date because it was her daughter's birthday. Simpson also recalled a day in early December 2001 when defendant took her to a parking lot in Mountain View where they drove around looking for a particular car. Simpson contradicted Alanis's account of the interaction with defendant at the courthouse in February 2002. According to Simpson, defendant merely wanted to know about the December 20, 2001 charge.

IV. Rebuttal

Officer Greg Sula was the Mountain View Police officer who detained defendant on December 28, 2001. Defendant told him at the scene that his name was David, the same name he had signed to the visitor's badge Frederito had issued to him earlier. When Hoffman approached the area where Sula was detaining defendant, defendant called out to Hoffman

3

> saying that he was just teaching him a lesson for getting his (defendant's) girlfriend pregnant. Defendant then told Sula that he was retaliating against Hoffman for Hoffman's getting defendant's brother's girlfriend pregnant. He revised the story at the police station where he insisted the retaliation was for Hoffman's impregnating "Linda," the girlfriend of defendant's friend Joe Beckov. Defendant even called Beckov from the police station and prompted him: "You know what I'm talking about? You know Linda?" When questioned by Officer Sula, Beckov denied that he knew anything about the matter.
>
> During trial, a juror reported to the court that he had heard Pieri speaking with Simpson in the hall after he had testified. The juror was sufficiently put off by hearing Pieri talk about his testimony after the judge had told him not to discuss it that the juror felt he could not be fair. That juror was excused. The prosecution then called Pieri back to the stand and asked him about his conversation with Simpson. Pieri admitted that he had spoken with her in the hall but explained that he had only discussed the fact that he had trouble remembering the dates. Pieri also admitted having suffered one felony and one misdemeanor conviction in the past.

Resp. Ex. F at 2-5.

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

4

identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000).

## DISCUSSION

As grounds for habeas relief petitioner asserts that: (1) the admission of six prior felonies violated his due process rights; (2) counsel's failure to object to the impeachment of witness Pieri deprived him of his right to effective assistance of counsel; and (3) the failure to excuse Juror Number Eight deprived him of his right to a fair trial.

**I.   Admission of the Prior Felonies**

Petitioner claims that the admission of six of his prior felonies to impeach him violated his right to due process. He argues that the admitted felonies were too many, too remote in time and too similar to the current charges. The California Court of Appeal accurately summarized the relevant circumstances as follows:

> Prior to his conviction in the instant matter defendant had been convicted of numerous felonies, including multiple credit card thefts and burglaries. The pertinent convictions begin with convictions in August 1987 for first degree burglary and theft. In December 1987 defendant was convicted of two more counts of first degree burglary. He received prison sentences for each of these convictions. After his release from prison defendant was convicted of theft in 1994 and again 1996. The 1987 and 1996 theft convictions involved

> the fraudulent use of credit cards.
>
> Prior to trial, defense counsel argued that all prior convictions should be excluded. When the trial court indicated its intention to allow prior conviction evidence for impeachment, counsel argued for the use of only the three 1987 burglaries, which constituted the three strike priors. Although these convictions were around 15 years old by the time of trial, counsel waived objection to the remoteness of the convictions, suggesting that he thought the older burglary convictions would be less damaging than convictions involving credit card theft. The prosecutor then pointed out that defendant had six additional convictions for credit card theft in 1987, which made a total of 12 convictions that could be used for impeachment.
>
> The trial court was concerned that introduction of all 12 convictions would be unduly prejudicial. (Evid.Code, § 352.) After the prosecutor agreed to limit his request to the first six convictions discussed, the trial court ruled: "With that modification, I will permit those to be used for purposes of impeachment if the defendant chooses to testify and only those."

Resp. Ex. F at 6-7.

Permitting a jury to hear evidence of prior crimes or bad acts may violate due process. *See Marshall v. Lonberger*, 459 U.S. 422, 438-39 n.6 (1983). A federal court cannot disturb on due process grounds a state court's decision to admit evidence of prior crimes or bad acts unless the admission of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). The admission of other crimes evidence violates due process where there are no permissible inferences the jury can draw from the evidence (in other words, no inference other than conduct in conformity therewith). *See McKinney v. Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993); *Jammal*, 926 F.2d at 920. If constitutional error is found, the court must also determine that the error "'had substantial and injurious effect or influence in determining the jury's verdict'" before granting habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In other words, the error must have resulted in "actual prejudice." *Id.*

The California Court of Appeal found that petitioner was not prejudiced by the admission of his past crimes. Resp. Ex. F at 7. The court reasoned that the prior convictions could not have prejudiced petitioner on the charges stemming from the December 20 burglary because the jury did not reach a verdict on those charges. *Id.* As

6

for the December 28 burglary, after reviewing the evidence against petitioner, the court found that the prosecution had a very strong case. *Id.* The evidence against petitioner included video surveillance footage of him in the building, multiple untruthful explanations given by petitioner to explain his behavior, and Hoffman's credit cards recovered from petitioner's pocket. *Id.* In light of this evidence, the Court of Appeal concluded that "it is not reasonably probable that [petitioner] would have achieved a more favorable result if the trial court had excluded the evidence of his prior convictions." *Id.* at 7-8.

To begin with, as the six admitted crimes, three burglaries and three thefts from 1987-1996, were crimes of moral turpitude, there were "permissible inferences" about petitioner's ability to tell the truth that a jury could draw from this evidence. *Jammal*, 926 F.2d at 920. When deciding whether to admit petitioner's prior crimes the trial court refused to allow in all 12 of petitioner's priors, excluding six convictions for credit card theft because of their similarity to the charged offense. The trial court conducted a balancing test concerning the rest of petitioner's priors and found that the probative value of the evidence outweighed the prejudicial impact they might have on the jury. Resp. Ex. C, Reporter's Transcript (hereinafter "RT") at 6. Of petitioner's 12 prior felonies, the ones admitted by the trial court were less prejudicial and did not pose a significant risk of bias against the petitioner. While some of the burglaries admitted were old, they were also very probative of petitioner's honesty. Under these circumstances, the admission of petitioner's prior felonies was not "arbitrary or so prejudicial that it rendered [his] trial fundamentally unfair" in violation of due process. *Marshall,* 459 U.S. at 438-39 n.6.

Even if there was a due process error in allowing evidence of petitioner's prior crimes, it did not have a "substantial and injurious effect or influence in determining the jury's verdict" and therefore, petitioner is not entitled to habeas relief. *Brecht*, 507 U.S. at 637. As the Court of Appeal noted, the prosecution's case against petitioner was strong, insofar as multiple pieces of evidence directly linking petitioner to the December 28 burglary, including the stolen credit cards recovered from petitioner's pocket, video surveillance footage of petitioner in the building, and eyewitness testimony linking petitioner

7

1  to the crime. Even without the past crimes introduced for impeachment, moreover,

2  petitioner's testimony was already cast in doubt by Officer Sula, who testified about the

3  multiple changes in petitioner's story between his arrest and his trial. Finally, the trial judge

4  limited the prejudice of prior convictions by instructing the jury that a prior conviction "may

5  be considered . . . only for the purpose of determining the believability of that witness."

6  Resp. Ex. C, Reporter's Transcript ("RT") at 665. Under these circumstances, the

7  admission of petitioner's prior crimes for impeachment did not result in "actual prejudice"

8  and no habeas relief can be granted for this claim.[1]

**II.     Ineffective Assistance of Counsel/Evidence of Pieri's Prior Convictions**

Petitioner claims that his counsel was ineffective for failing to object to the prosecutor's impeachment of witness Pieri with prior crimes that did not involve moral turpitude. The relevant exchange took place after the prosecution recalled Richard Pieri during the rebuttal phase:

> Q [by the District Attorney]: Now, sir, can I ask you have you-did you suffer a felony conviction for sale of narcotics in 1988?
>
> A. Transportation and possession.
>
> Q. Did you also suffer a conviction for theft to the utility service in 1996?
>
> A. As a misdemeanor.
>
> Q. You did suffer-
>
> A. Yes. Yes.
>
> Q. You committed that crime?
>
> A. I was accused-I was found guilty of it.

Resp. Ex. F at 8.

Petitioner claims that the record does not establish that Pieri was convicted of selling narcotics, only transportation and possession, and his counsel should have objected on the

---

[1] Petitioner also raises the claim for the first time in his traverse that trial counsel was ineffective in allowing the six priors to be admitted. For the reasons discussed above, the admission of the evidence was neither erroneous nor prejudicial; for the same reasons, counsel was not ineffective in failing to prevent its admission.

8

grounds that transportation and possession are not crimes of moral turpitude. Petitioner also maintains that Pieri did not admit to the conduct underlying his misdemeanor conviction, and his counsel was ineffective for failing to object to the prosecution's introduction of that evidence for impeachment purposes.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

The California Court of Appeal applied the *Strickland* standard and found that petitioner's counsel was not constitutionally ineffective. Resp. Ex. F at 9. The court reasoned that there were "plausible tactical reasons" for petitioner's counsel to refrain from objecting, including the fact that an objection would only have called more attention to Pieri's criminal record and cast his testimony in doubt. *Id.* Also, the court explained that Pieri's statement, "transportation and possession," could be viewed as an "acknowledgment that he had been convicted of transportation and possession for sale, which indisputably, is a crime of moral turpitude and admissible for impeachment." *Id.* at 9.

As the Court of Appeal applied the correct federal standard from *Strickland*, the state court's decision is not "contrary to" clearly established federal law within the meaning of 28 U.S.C. § 2254. *See Williams (Terry)*, 529 U.S. at 412-13. Therefore, this court need only consider whether the Court of Appeal "unreasonably" applied the *Strickland* standard. *Id.* at 413.

9

Petitioner's counsel acted reasonably during the cross examination of Pieri. Pieri's evasive answers to the prosecution's questions actually worked to petitioner's advantage by decreasing the impact of the prosecution's impeachment of his testimony. Had petitioner's counsel objected this would have called unnecessary attention, right before closing argument, to Pieri's criminal record. The same concerns apply to Pieri's evasive statement about his misdemeanor conviction in that any objection to that answer would have only called further unwanted attention to Pieri's criminal history right before closing argument. Consequently, this court does not find that the performance of petitioner's trial counsel fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88.

Even if petitioner's counsel was objectively unreasonable, petitioner was not prejudiced by the error. Had an objection to Pieri's impeachment been successful, it would have had little impact on petitioner's case. Pieri's testimony did not play an especially important role in petitioner's defense, and Pieri's criminal history had little to do with the jury's verdict. Petitioner was caught at the scene of the crime with the stolen credit cards in his pocket, video surveillance footage and eyewitnesses also linked petitioner to the crime, and petitioner had changed his story multiple times before trial. This is not the type of evidence that could be easily outweighed, even if Pieri's testimony were believed. Thus, even if an objection by counsel would have succeeded, the absence of counsel's objection to  does not create "a reasonable probability that . . . the result of [petitioner's trial] would have been different." *Strickland*, 466 U.S. at 694. As this court has reached the same conclusion as the Court of Appeal, the state court applied the *Strickland* test reasonably.

As the state court decision was neither contrary to nor an unreasonable application of federal law, petitioner is not entitled to habeas relief on this claim.

**III.    Juror Number Eight**

Petitioner claims that the trial court's inadequate inquiry into whether Juror Number Eight committed misconduct violated petitioner's right to a fair trial. The Court of Appeal described the relevant circumstances as follows:

10

>Midway through trial the court learned that Juror No. 8 had spoken with prosecution witnesses Karen Strouse (one of the victims of the December 20 burglary) and Officer Sula, (the officer who arrested defendant for the December 28 burglary) outside the courtroom. The court called the juror out of the presence of the rest of the jury and inquired into the circumstances and the content of the communications. The juror explained that during a break the day before he had seen Strouse studying the driver's license handbook and he remarked to her that not all the law was in the book. They had a short discussion about traffic law and the legality of entering an intersection on a yellow light. Sula contributed some comments on the subject. The juror was wearing his badge but the two witnesses did not seem to recognize him as a juror. The communication took place before Strouse and Sula had been called as witnesses. The juror explained that he did not know at the time that the two were going to be witnesses.
>
>The next day, Sula was in the cafeteria with the prosecutor when the juror nodded to him. Sula told his companion, "This guy really can quote the law on driving, you know?" The prosecutor reminded Sula that he was not supposed to talk to the juror. Juror No. 8 told Sula, "When I talked to you before, it was before you were a witness. Now I can't say anything at all." The trial court confirmed that no other communication had taken place and that the juror had told the court all there was to tell about the interactions. Counsel did not question the juror. No one questioned whether or not the juror should be excused.

Ex. F at 9-10

Petitioner argues that the trial court should have conducted an inquiry into Officer Sula's behavior in order to determine whether Juror Number Eight committed misconduct.

"[P]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 142 (1892). *Mattox*'s "presumption is not conclusive, but the burden rests heavily on the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." *Remmer v. United States*, 347 U.S. 227, 229 (1954). "[I]f an unauthorized contact with a juror is *de minimus*, the defendant must show that the communication could have influenced the verdict before the burden of proof shifts to the prosecution." *Caliendo v. Warden of Calif. Men's Colony*, 365 F.3d 691, 696 (9th Cir. 2004). However, the *Mattox* presumption applies to any unauthorized communication that

"crosses a low threshold to create the potential for prejudice" and "raises a risk of influencing the verdict." *Id.* at 697.  Under such circumstances, a "new trial must be granted unless the prosecution shows that there is no reasonable possibility that the communication will influence the verdict." *Id.*

The Court of Appeal found that the trial court "properly and thoroughly questioned" Juror Number Eight and determined that there was no misconduct.  Ex. F at 10.  The court found that the unauthorized communication between the juror and the witnesses was *de minimus* and there was no likelihood that Juror Number Eight was biased.  Ex. F at 11-12.

This court agrees with the California Court of Appeal that Juror Number Eight's unauthorized conversation about traffic laws was *de minimus* and could not have influenced the verdict.  At the time of the conversation, Juror Number Eight did not know that Sula and Strouse were witnesses in petitioner's trial.  The conversation revolved entirely around traffic laws and was completely unrelated to petitioner's case.  The trial court established, through an exhaustive examination of Juror Number Eight, that the juror was not prejudiced by the conversation with the two prosecution witnesses.  In his petition, petitioner admits that there was no willful misconduct on the part of Juror Number Eight, and instead focuses his argument on the need to question Officer Sula about the conversation.  There is no indication, however, that Sula would have said anything different about the conversation than what Juror Number Eight had reported.  Moreover, Sula's comment to the prosecutor upon seeing Juror Number Eight in the cafeteria indicated that their conversation had in fact revolved around traffic law, not petitioner's trial.  Under these circumstances, the trial court's failure to examine Sula did not violate petitioner's right to due process.

The state court's rejection of this claim was neither contrary to nor an unreasonable application of federal law.  Accordingly, petitioner is not entitled to habeas relief on this claim.[2]

---

[2] Petitioner also raises the claim for the first time in his traverse that trial counsel was ineffective in failing to cause the trial court to question Sula and Strouse.  For the same reasons that the trial court's inquiry into the issue of juror misconduct was sufficient and

12

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: March 2, 2009.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.05\POST323.RUL.wpd

---

that caused no violation of due process, counsel could reasonably decide that further inquiry was not necessary without causing prejudice to the outcome of the case.